**17 MAG   2445   ORIGINAL**

Approved: _____
          NOAH FALK/ANDREW THOMAS
          Assistant United States Attorneys

Before:   HONORABLE JAMES C. FRANCIS IV
          United States Magistrate Judge
          Southern District of New York

*[Stamp: U.S. DISTRICT COURT FILED MAR 31 2017 S.D. OF N.Y.]*

*[Stamp: DOC #_____]*

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :    **SEALED COMPLAINT**

       - v. -            :    Violations of
                               18 U.S.C. §§ 1341, 1343, and
GODEL SEZANAYEV,          :    1349
     a/k/a "Gary,"
MARK MULLAKANDOV,         :    COUNTY OF OFFENSE:
ALBERT FOOZAILOV,                  NEW YORK
IMANIL MURATOV,           :
     a/k/a "Eddy,"         :
MANASHE SEZANAYEV,
     a/k/a "Michael"       :
NATHAN ITZCHAKI,
ARKADIY ISRAILOV,         :
ALI JAVIDNEZHAD,
MARK NATANZON,           :
SHOLOM MURATOV,
MENACHEM ABRAMOV, and     :
NIZAMUDEN AKBARI,

           Defendants.      :

- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       LUKE B. HARDISON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

#### (Conspiracy to Commit Wire Fraud)

       1. From at least in or about January 2015 up to at least in or about November 2016, in the Southern District of New

York and elsewhere, GODEL SEZANAYEV a/k/a "Gary", ALBERT FOOZAILOV, IMANIL MURATOV a/k/a "Eddy," MANASHE SEZANAYEV a/k/a "Michael," ALI JAVIDNEZHAD, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

2.   It was a part and an object of the conspiracy that GODEL SEZANAYEV a/k/a "Gary", ALBERT FOOZAILOV, IMANIL MURATOV a/k/a "Eddy," MANASHE SEZANAYEV a/k/a "Michael," ALI JAVIDNEZHAD, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343, to wit, GODEL SEZANAYEV, MANASHE SEZANAYEV, FOOZAILOV, IMANIL MURATOV, and JAVIDNEZHAD, agreed to obtain diamond merchandise from a victim ("Victim-1") without providing Victim-1 full payment that they had promised to make and, in the course of the scheme, GODEL SEZANAYEV, from New York, contacted Victim-1, who was in New Jersey, by telephone.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

(Conspiracy to Commit Wire Fraud)

3.   From at least in or about May 2015 up to at least in or about June 2015, in the Southern District of New York and elsewhere, GODEL SEZANAYEV a/k/a "Gary", ARKADIY ISRAILOV, NIZAMUDEN AKBARI, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

4.   It was a part and an object of the conspiracy that GODEL SEZANAYEV a/k/a "Gary", ARKADIY ISRAILOV, NIZAMUDEN AKBARI, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and

fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343, to wit, GODEL SEZANAYEV, ISRAILOV, and AKBARI agreed to defraud a particular person at a Las Vegas trade show of valuable diamond merchandise by paying with a worthless check and, in the course of the scheme, caused the intended victim, who was in fact a confidential source for law enforcement ("CS-2"), to place a telephone call to GODEL SEZANAYEV's New York office.

(Title 18, United States Code, Section 1349.)

## COUNT THREE

### (Conspiracy to Commit Mail Fraud)

5.     From at least in or about December 2015, up to and including at least in or about December 2016, in the Southern District of New York and elsewhere, MARK MULLANDKANDOV, ALBERT FOOZAILOV, NATHAN ITZCHAKI, MARK NATANZON, SHOLOM MURATOV, and MENACHEM ABRAMOV, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1341.

6.     It was a part and object of the conspiracy that MARK MULLAKANDOV, ALBERT FOOZAILOV, NATHAN ITZCHAKI, MARK NATANZON, SHOLOM MURATOV, and MENACHEM ABRAMOV, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom, such matters and things, and would and did cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were

directed to be delivered by the person to whom they were
addressed, such matters and things, in violation of Title 18,
United States Code, Section 1341, to wit, MULLAKANDOV,
FOOZAILOV, NATANZON, ITZCHAKI, SHOLOM MURATOV, and ABRAMOV
induced numerous victims in Mumbai, India ("Victim-2," "Victim-
3," "Victim-4," and "Victim-5") to send diamonds by interstate
carrier by purporting to agree to payment terms they did not,
and had no intention to, honor.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges
are, in part, as follows:

7.    I have been a Special Agent with the FBI since
approximately 2012. I have also been personally involved in the
investigation of this matter, and have been involved in the
investigation and prosecution of numerous fraudulent schemes,
including frauds concerning the purchase or sale of diamonds.
This affidavit is based upon my own observations, conversations
with other law enforcement agents and others, and my examination
of reports and records prepared by others. Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation. Where
the contents of documents and the actions, statements, and
conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated. All
references herein to 47th Street are to 47th Street in
Manhattan, New York, unless otherwise indicated.

### Manhattan's Diamond District

8.    Manhattan's Diamond District is a cluster of
jewelry and gemstone businesses on 47th Street between Fifth
Avenue and Sixth Avenue. The Diamond District is America's
busiest hub for the import and export of diamonds, and it
houses, among others, wholesalers, brokers, jewelers, and
retailers. Diamond brokers typically sell loose diamonds, owned
by wholesalers, to jewelers and retailers. Jewelers and
retailers often purchase their diamonds through brokers and, in
turn, sell diamonds or diamond jewelry to customers.

9.   Wholesalers in the Diamond District frequently obtain their wares from overseas markets, especially those in Europe, South Africa, and India. Frequently, for example, New York wholesalers travel to foreign merchants, select products from the merchants' inventories to purchase, and arrange for those products to be shipped from the foreign merchants abroad to the wholesalers in New York by a secured transportation company.

10.   Common payment terms between wholesalers include cash-on-delivery, payment within thirty days, and partial payment upon delivery with full payment within a fixed period thereafter. When a buyer takes possession of goods from a seller without first paying for those goods, the seller faces risk, including the risk that the buyer does not pay as agreed. To mitigate these risks, diamond sellers typically insist on know-your-customer documents from buyers, conduct initial transactions with buyers on cash-on-delivery terms, and limit the amount of credit extended to any one buyer at any particular time.

11.   Diamond wholesalers often provide brokers with goods on consignment. Diamond wholesalers typically memorialize these transactions with memoranda. A typical memorandum records what the wholesaler has entrusted to a broker by identifying and describing the goods being tendered, including the price of the goods; such a memorandum also records the terms on which the goods are being tendered, including the period of time during which the broker may retain the goods. If the broker sells the goods, the broker owes the wholesaler the price listed on the memorandum. If the broker does not sell the wholesaler's goods, the broker must return the goods to the wholesaler by the time specified in the memorandum. Until the goods are sold, the goods remain part of the wholesaler's inventory.

## Background on the Schemes

12.   Since in or about 2015, the FBI has been investigating a series of predatory frauds perpetrated by a group of diamond merchants in New York City. This group aims to obtain diamonds from legitimate sellers for little or no payment. The group profits from their frauds by reselling the diamonds. The group primarily focuses on the sellers of small

round stones called melee diamonds, which usually do not bear the unique numerical identifiers common on larger stones, and thus are difficult to track.

13. The groups aims to obtain diamonds from victims on consignment or credit, such that payment is due in the future. The group's most common technique is the "bust out": a deliberate effort first, to build up credit with a victim, and, second, at the point of maximum credit, to walk away with the victim's goods. In addition to the "bust out," the group deploys a variety of ruses, including bad checks, false references, forged documents, and simple lies to convince victims to part with diamonds without first demanding payment.

14. Once victims begin to insist on late, missing, or bounced payments, members of the group refuse to make good on their agreements. Instead, members of the group tell a variety of tales to excuse full payment, such as that the diamonds have been lost, another customer took the victim's diamonds and has refused to pay, a different member of the group will repay the victim, and the victim can receive repayment if the victim assists the group in still another fraud.

### The Conspiracy to Bankrupt Victim-1

15. In or about 2014, a diamond merchant ("Victim-1") from outside the United States set up a diamond business (the "Victim-1 Business") in Manhattan's Diamond District. Soon, GODEL SEZANAYEV a/k/a "Gary", MANASHE SEZANAYEV a/k/a "Michael," ALBERT FOOZAILOV, IMANIL MURATOV a/k/a "Eddy," and ALI JAVIDNEZHAD, the defendants, deployed an ad hoc strategy to obtain as much of Victim-1's diamond inventory as possible without full payment.

16. Other law enforcement agents and I have interviewed Victim-1 and an employee of the Victim-1 Business ("Employee-1"). Based on those interviews and a review of a jewelry trade show attendance register, I have learned, in part, the following:

a. Victim-1 established the Victim-1 Business in Manhattan, New York in or about August 2014. The Victim-1 Business operated as a U.S. subsidiary of Victim-1's Indian diamond company. The Victim-1 Business focused on melee diamonds.

   b. In or about October 2014, the Victim-1 Business hosted a booth at a trade show in Manhattan, New York. While attending that trade show, Victim-1 met ALBERT FOOZAILOV, the defendant, who, in turn, introduced Victim-1 to IMANIL MURATOV a/k/a "Eddy," and ALI JAVIDNEZHAD, the defendants.

   c. From on or about January 18, 2015, until on or about January 20, 2015, the Victim-1 business hosted a booth at another diamond trade show in Manhattan, New York. On or about January 21, 2015, after the show concluded, Employee-1 received a telephone call from a man who introduced himself as GODEL SEZANAYEV a/k/a "Gary", the defendant, the owner of Arnage Diamonds ("Arnage"). GODEL SEZANAYEV asked Employee-1 to visit Arnage to show GODEL SEZANAYEV the Victim-1 Business's merchandise. Employee-1 agreed.

*The Delayed Payment Scam*

   17. Based on interviews of Victim-1, Employee-1, a review of telephone toll records, a review of purchase invoices and memoranda, and a review of bank records, I have learned, in part, the following:

   a. On January 21, 2015, Employee-1 and another employee of the Victim-1 Business ("Employee-2") brought several parcels of diamonds (the "Display Parcels") to 31 W. 47th Street, Arnage's office. Employee-1 and Employee-2 met GODEL SEZANAYEV a/k/a "Gary", the defendant, and showed him the Display Parcels. GODEL SEZANAYEV selected one of the Display Parcels that contained larger, higher quality diamonds than the others. GODEL SEZANAYEV told Employee-1 that he wanted to purchase additional, similar diamonds. Employee-1 gathered the Display Parcels and he and Employee-2 left Arnage and returned to the Victim-1 Business's office.

   b. On or about January 22, 2015, GODEL SEZANAYEV called Employee-1 and asked when GODEL SEZANAYEV could inspect more diamonds. At approximately 4:00 pm, Victim-1 and Employee-1 brought approximately four parcels of diamonds to Arnage. They also brought four memoranda, with each memorandum identifying the diamonds contained in one parcel. GODEL SEZANAYEV inspected the four parcels and removed from each the stones that he wished to purchase (collectively, the "Selected Diamonds"). GODEL SEZANAYEV noted his choices on the four memoranda.

c.   GODEL SEZANAYEV agreed to purchase the
Selected Diamonds for $532,991.40. After negotiating the payment
terms, GODEL SEZANAYEV and Victim-1 agreed that GODEL SEZANAYEV
would pay Victim-1 by check in seven equal installments. The
seven checks were to be delivered immediately, but only the
first check was to be dated for immediate deposit; the other
checks were to be dated at thirty-day intervals.

d.   Victim-1 agreed to the payment terms on the
condition that GODEL SEZANAYEV provided adequate references. At
the January 22, 2015 meeting, GODEL SEZANAYEV listed a
particular person as a reference (the "Reference"). Employee-1
knew the Reference from prior business dealings. GODEL SEZANAYEV
called the Reference and placed the call on speakerphone for
Victim-1 and Employee-1 to listen. By speakerphone, the
Reference gave a positive recommendation of GODEL SEZANAYEV.

e.   After hearing the Reference's positive
recommendation, Victim-1 and Employee-1 left the Selected
Diamonds in GODEL SEZANAYEV's custody while they returned to the
Company to prepare a final sales invoice and to check other
references for GODEL SEZANAYEV. Victim-1 contacted other Indian
businesspersons in the diamond trade; these Indian
businesspersons told Victim-1 that Victim-1 should not trust
GODEL SEZANAYEV or do business with him.

f.   Later on January 22, 2015, Victim-1 and
Employee-1 returned to Arnage with a finalized invoice and met
with GODEL SEZANAYEV. Victim-1 told GODEL SEZANAYEV that the
terms of the deal would have to be cash on delivery, otherwise,
Victim-1 said, GODEL SEZANAYEV would have to return the Selected
Diamonds. GODEL SEZANAYEV responded that he would return the
Selected Diamonds. He said, however, that he had already moved
the Selected Diamonds to his "factory" located at 36 W. 47th
Street (the "Factory").

g.   GODEL SEZANAYEV, Victim-1, and Employee-1
departed Arnage's offices and walked to the Factory. GODEL
SEZANAYEV pressed the door buzzer, but nobody responded. GODEL
SEZANAYEV remarked that the Factory employees must have left for
the day. SEZANAYEV told Victim-1 and Employee-1 that he would be
traveling to Miami, Florida the following day, January 23, 2015,
but that they could retrieve the Selected Diamonds from GODEL
SEZANAYEV's brother ("CC-1").

h.   At approximately 7:37 p.m., GODEL SEZANAYEV
called Victim-1, while Victim-1 was at his New Jersey residence

and discussed, in substance and in part, how Victim-1 could get in touch with CC-1.

i.    On or about Friday, January 23, 2015, Employee-1 called CC-1 regarding the Selected Diamonds. CC-1 said that he would call Employee-1 once he reached the Factory. Throughout the day, Employee-1 and CC-1 spoke several more times by telephone. After repeatedly delaying their meeting, CC-1 told Employee-1 that his car had a flat tire and that he would not be able to return the Selected Diamonds that day.

j.    On Wednesday, January 28, 2015, Victim-1 and Employee-1 arrived at Arnage unannounced and met with GODEL SEZANAYEV. GODEL SEZANAYEV told them he had sold the Selected Diamonds on the prior day, January 27, 2015, so he was unable to return the Selected Diamonds to Victim-1 and Employee-1. As evidence of the sale, GODEL SEZANAYEV showed Victim-1 and Employee-1 an invoice dated January 27, 2015 in the amount of approximately $549,000.

k.    GODEL SEZANAYEV told Victim-1 and Employee-1 that he would pay for the Selected Diamonds immediately and asked for an additional discount. In an effort to obtain payment, Victim-1 agreed to a discount of approximately $27,991.40, bringing the price of the Selected Diamonds to approximately $505,000. GODEL SEZANAYEV then paid Victim-1 $25,000 cash, reducing GODEL SEZANAYEV's balance to $480,000. GODEL SEZANAYEV asked Victim-1 and Employee-1 to return to Arnage later in the day to collect an additional $100,000. Victim-1 and Employee-1 returned to Arnage and attempted to collect $100,000 from GODEL SEZANAYEV later in the day, but they did not succeed because GODEL SEZANAYEV did not return their calls.

l.    On or about January 29, 2015, at Victim-1's office's, GODEL SEZANAYEV paid Victim-1 $5,000 toward the price of the Selected Diamonds, reducing his balance due to $475,000.

18.    On February 3, 2015, acting at the direction of the FBI, Victim-1 confronted GODEL SEZANAYEV a/k/a "Gary", the defendant, to demand repayment. The FBI provided Victim-1 with an audio recording device, and the meeting was recorded. Based on a review of that recording, visual surveillance, and conversations with Victim-1 and Employee-1, I have learned, among other things, the following:

a.    On or about February 3, 2015, at approximately 11:00 am, Victim-1 and Employee-1 traveled to the office of American Gold Refinery ("AGR") on 47th Street.

b.    Victim-1 asked the receptionist to speak with GODEL SEZANAYEV. The receptionist responded that GODEL SEZANAYEV was away. The receptionist alerted another male in the office ("CC-2"), that Victim-1 and Employee-1 had arrived. CC-2, in the presence of Victim-1, called GODEL SEZANAYEV by phone. After speaking briefly on the phone, CC-2 handed the phone to Victim-1. Victim-1 told GODEL SEZANAYEV that he wanted to speak to GODEL SEZANAYEV about the Selected Diamonds. GODEL SEZANAYEV responded that he was going to return the Selected Diamonds and that he would arrive at AGR in approximately fifteen minutes.

c.    Approximately twenty minutes later, GODEL SEZANAYEV arrived. GODEL SEZANAYEV returned one of the parcels of the Selected Diamonds (the "Returned Parcel") to Victim-1. The Returned Parcel contained approximately 39.15 carats of loose diamonds worth approximately $14,837.85, but did not return the remaining approximately $460,000 in diamonds. During this meeting, Victim-1 accused GODEL SEZANAYEV of cheating him. GODEL SEZANAYEV, in substance and in part, told Victim-1 that GODEL SEZANAYEV had sold the Selected Diamonds to "Mike" and that "Mike" had not yet paid him. GODEL SEZANAYEV said that "Mike" had said he would not have the money to pay GODEL SEZANAYEV for at least two weeks. GODEL SEZANAYEV then told Victim-1, in substance and in part, (i) "Take me to court . . . I pay you when I feel like it", (ii) "Nobody can do shit to me," and (iii) "If I need, I fuck somebody if I want. A different way I can fuck somebody . . . . You will get your money when I am ready to pay." To Employee-1, GODEL SEZANAYEV said, in substance and in part, "If I see you here, you never get paid."

*The Cash Payment Scam*

19.    From speaking with two individuals ("Business Owner-1" and "Business Owner-2"; together, the "Business Owners") who own and operate a diamond business (the "Diamond Business") located in the Diamond District, I learned the following, in substance and in part:

a.    In or about January 2015, the Business Owners spoke with MANASHE SEZANAYEV a/k/a "Michael," the defendant, about the possibility that MANASHE SEZANAYEV would rent office space from the Diamond Business. As of the end of

January 2015, however, the Business Owners had not rented office
space to MANASHE SEZANAYEV, nor had they offered MANASHE
SEZANAYEV a position with the Diamond Business.

       b.   On or about the morning of January 28, 2015,
MANASHE SEZANAYEV visited the Diamond Business and asked
Business Owner-1 if he could use the Diamond Business's offices
to meet with potential clients. Business Owner-1 agreed.

       c.   On or about the afternoon of January 28,
2015, Business Owner-1 observed MANASHE SEZANAYEV return to the
Diamond Business offices carrying a black duffel bag (the
"Duffel Bag") accompanied by two men ("UM-1" and "UM-2").

      20.   From speaking with Victim-1, Employee-1, and
Business Owner-1, reviewing a video recording of a meeting
between Victim-1 and MANASHE SEZANAYEV a/k/a "Michael," the
defendant, and reviewing telephone toll records, I learned the
following, in substance and in part:

       a.   On or about January 28, 2015, at
approximately 1:00 pm, as Victim-1 and Employee-1 were leaving
the meeting with GODEL SEZANAYEV a/k/a "Gary," defendant, at 31
W. 47th Street, they encountered MANASHE SEZANAYEV. Neither
Victim-1 nor Employee-1 had previously met MANASHE SEZANAYEV.
During that initial meeting, MANASHE SEZANAYEV introduced
himself as "Michael," and stated, in substance and in part, that
(i) he was the owner of the Diamond Business, (ii) he also
worked in the diamond industry, and (iii) he was interested in
purchasing diamonds from Victim-1.

       b.   After Victim-1 and Employee-1 encountered
MANASHE SEZANAYEV, at approximately 1:30 p.m., MANASHE SEZANAYEV
placed a telephone call to GODEL SEZANAYEV.

       c.   Later that day, at approximately 3:00 p.m.,
MANASHE SEZANAYEV called the Victim-1 Business, spoke to Victim-
1, and stated that he would like to inspect some of Victim-1's
diamond merchandise at the Diamond Business's offices. Following
the call between MANASHE SEZANAYEV and Victim-1, Victim-1 and
Employee-1 gathered various parcels of diamonds (the "Second
Display Parcels") from Victim-1's inventory and walked to the
Diamond Business.

d.    Victim-1 and Employee-1 arrived at the Diamond Business and informed Business Owner-1 that they were there to meet MANASHE SEZANAYEV. Business Owner-1 informed MANASHE SEZANAYEV that Victim-1 and Employee-1 had arrived to meet him. Shortly thereafter, UM-1 and UM-2 left the Diamond Business.

e.    MANASHE SEZANAYEV escorted Victim-1 and Employee-1 to an anteroom within the Diamond Business (the "Anteroom"). MANASHE SEZANAYEV then asked Business Owner-1 if MANASHE SEZANAYEV could disable the security cameras in the Anteroom. Business Owner-1 said that MANASHE SEZANAYEV could not disable the security cameras.

f.    Inside the Anteroom, Victim-1 and Employee-1 provided MANASHE SEZANAYEV with the Second Display Parcels. MANASHE SEZANAYEV examined the Second Display Parcels and selected certain diamonds to purchase. MANASHE SEZANAYEV expressed an interest in purchasing a large quantity of similar diamonds. Employee-1 then left the Diamond Business offices to gather additional diamonds. Victim-1 remained with MANASHE SEZANAYEV to negotiate sale terms.

g.    Employee-1 returned to the Diamond Business with additional parcels of diamonds (the "Third Display Parcels"). MANASHE SEZANAYEV inspected the Third Display Parcels and identified diamonds he wished to purchase, in addition to the diamonds he had previously selected from the Second Display Parcels (collectively, the "Second Selected Diamonds").

h.    After inspecting the Second Selected Diamonds, MANASHE SEZANAYEV told Victim-1 that he wished to purchase them on credit. Victim-1 responded that Victim-1 would only accept cash on delivery, but MANASHE SEZANAYEV refused those terms. Victim-1 and Employee-1 gathered the Second Selected Diamonds, the Second Display Parcel, and the Third Display Parcel, and departed the Diamond Business.

i.    After Victim-1 and Employee-1 departed the Diamond Business, MANASHE SEZANAYEV asked Business Owner-1 to allow him to remain in the Diamond Business offices for the afternoon. MANASHE SEZANAYEV said that Victim-1 and Employee-1 would be returning shortly. Business Owner-1 told MANASHE

12

SEZANAYEV that he had to leave the Diamond Business immediately, and MANASHE SEZANAYEV did so.

      j.   Later that same day, at approximately 5:00 p.m., MANASHE SEZANAYEV contacted Victim-1's business by telephone, spoke to Victim-1, and said that he would accept cash on delivery terms for the Second Selected Diamonds. MANASHE SEZANAYEV instructed Victim-1 and Employee-1 to bring the diamonds they had discussed to a particular address on 47th Street, along with a memorandum of the sale terms and price.

      k.   Victim-1 and Employee-1 traveled to the address MANASHE SEZANAYEV had given them and encountered MANASHE SEZANAYEV and another man ("UM-3"). Victim-1 and Employee-1 brought with them the Second Selected Diamonds and a memorandum describing the diamonds and the sale terms. MANASHE SEZANAYEV inspected the Second Selected Diamonds again, and indicated that he no longer wished to purchase three of the diamonds included in the Second Selected Diamonds. Victim-1 collected the excluded diamonds and revised the memorandum to reflect that the price of the remaining Second Selected Diamonds (the "Sale Diamonds") was $522,330.65.

      l.   Victim-1 and Employee-1 once again stated that the sale would be on cash on delivery terms. MANASHE SEZANAYEV provided Victim-1 the Duffel Bag, which MANASHE SEZANAYEV stated contained $522,330.65. Victim-1 then demanded payment by certified check. MANASHE SEZANAYEV responded that it would take him approximately 15 minutes to obtain a certified check to pay for the Sale Diamonds. MANASHE SEZANAYEV then handed the Duffel Bag to Victim-1 and stated that Victim-1 could hold the Duffel Bag as collateral while MANASHE SEZANAYEV left with the Sale Diamonds to obtain a check from his bank. MANASHE SEZANAYEV took the Sale Diamonds from Victim-1 and left the meeting.

      m.   Victim-1 and Employee-1 waited for MANASHE SEZANAYEV to return for over 15 minutes, but MANASHE SEZANAYEV did not return.

      n.   Victim-1 and Employee-1 returned to their offices, where they opened and inspected the Duffel Bag. They found the bag contained approximately $12,300. The vast majority

of the notes in the Duffel Bag were $1 bills, which had been stacked and concealed beneath $100 bills, and bound together with rubber bands.

o.   Later that evening, at approximately 6:42 p.m., 7:14 p.m., and 8:28 p.m., MANASHE SEZANEYEV and GODEL SEZANAYEV spoke by telephone.

*The Bust-Out Scam*

21.   Based on interviews with Victim-1, a review of bank account records, and a review of inventory records, I learned the following, in substance and in part:

a.   After meeting IMANIL MURATOV a/k/a "Eddy" and ALI JAVIDNEZHAD, the defendants, at a Manhattan trade show in or about October 2014, Victim-1 began business relationships with the men. Victim-1 provided diamond merchandise to IMANIL MURATOV and JAVIDNEZHAD so that IMANIL MURATOV and JAVIDNEZHAD could broker diamond sales for Victim-1 under the following arrangement: Victim-1 would give IMANIL MURATOV and JAVIDNEZHAD diamonds on consignment; IMANIL MURATOV and JAVIDNEZHAD would find buyers for those diamonds; and IMANIL MURATOV and JAVIDNEZHAD would pay Victim-1 for the diamonds as they were sold.

b.   Beginning in or about August 2014, Employee-1, on behalf of the Victim-1 Business, had sold diamonds to ALBERT FOOZAILOV, the defendant. After the October 2014 trade show, Victim-1 provided additional diamonds to FOOZAILOV, with some diamonds given to FOOZAILOV on consignment for him to sell on Victim-1's behalf, and other sold to FOOZAILOV on terms requiring payment on a particular date in the future.

c.   By in or about December 2014, Victim-1 had transacted approximately $600,000 worth of business through IMANIL MURATOV and JAVIDNEZHAD. Around that time, however, IMANIL MURATOV and JAVIDNEZHAD began refusing to either return or pay for approximately $1,200,609 of goods Victim-1 had given to them on credit (the "Credit Diamonds"). IMANIL MURATOV and JAVIDNEZHAD offered Vicitim-1 a range of excuses for the delayed payment, including, in substance, that IMANIL MURATOV and JAVIDNEZHAD had given the goods to a customer who had not paid them.

d.    In or about March 2015, another merchant
("CC-3"), whom FOOZAILOV had introduced to Employee-1, had
attempted to pay Victim-1 with a bounced check. After CC-3's
nonpayment, and after hearing rumors that CC-3 was using Victim-
1 as a reference, Victim-1 decided to insist on immediate
payment of all overdue monies owed by IMANIL MURATOV and
JAVIDNEZHAD.

22.    On or about June 19, 2015, Victim-1 confronted
IMANIL MURATOV a/k/a "Eddy" and ALI JAVIDNEZHAD, the defendants.
Prior to the meeting the FBI provided Victim-1 with an audio
recording device. Based on interviews of Victim-1, a review of
audio recordings created by Victim-1, and visual surveillance, I
have learned, in part, the following:

a.    On or about June 19, 2015, at approximately
12:03 pm, IMANIL MURATOV arrived at Victim-1's office. Victim-1
inquired as to JAVIDNEZHAD's whereabouts. IMANIL MURATOV said
that JAVIDNEZHAD would not be attending the meeting. Victim-1
insisted that JAVIDNEZHAD attend. IMANIL MURATOV then placed a
phone call. Soon thereafter JAVIDNEZHAD arrived.

b.    Victim-1 told IMANIL MURATOV and JAVIDNEZHAD
to either pay him for the Credit Diamonds or return the Credit
Diamonds. Victim-1 stated that without repayment he would be
forced to go to the police.

c.    JAVIDNEZHAD said that he had given the
Credit Diamonds to another merchant, who had subsequently sold
them to a third party who had failed to pay for the diamonds.
Victim-1 responded that JAVIDNEZHAD should have informed Victim-
1 of what had happened because Victim-1 had memorandum insurance
that would have provided coverage for the losses on the Credit
Diamonds.

d.    Upon hearing that Victim-1 had memorandum
insurance, IMANIL MURATOV stated that Victim-1 should file a
fake insurance claim. IMANIL MURATOV suggested that Victim-1
create a fake memorandum and offered to find a fake buyer.
IMANIL MURATOV said that he and Victim-1 could make it appear to
an insurer that a buyer had simply walked away with the goods.
Victim-1 responded that he would not have insurance coverage in

15

IMANIL MURATOV's scenario and that, in any event, insurance fraud was unethical.

23.   On June 23, 2015, Victim-1, acting at the FBI's direction, called IMANIL MURATOV at approximately 12:06 p.m. The call was audio recorded. Based on a review of that recording, and conversations with Victim-1, I know that during that call, Victim-1 told IMANIL MURATOV that Victim-1's suppliers in India were pressuring Victim-1 to repay the debt stemming from the Credit Diamonds. Victim-1, in substance, asked IMANIL MURATOV to visit Victim-1's office to discuss IMANIL MURATOV's suggestion that Victim-1 file a false insurance claim. IMANIL MURATOV, in substance, told Victim-1 not to discuss the matter over the phone and said that he would visit Victim-1's office.

24.   Based on visual surveillance, I know that at approximately 12:12 pm, IMANIL MURATOV a/k/a "Eddy" and ALI JAVIDNEZHAD, the defendants, arrived at Victim-1's office. The FBI provided Victim-1 with an audio recording device, and the meeting was audio recorded. Based on conversations with Victim-1, and a review of the audio recording, I have learned that, in substance and in part, the following discussion occurred:

a.   Victim-1 told IMANIL MURATOV and JAVIDNEZHAD that Victim-1's Indian suppliers were pressuring Victim-1 and that Victim-1 needed IMANIL MURATOV and JAVIDNEZHAD to repay Victim-1.

b.   IMANIL MURATOV responded that Victim-1 had three choices. The first and second option involved convincing his suppliers to give goods to IMANIL MURATOV and JAVIDNEZHAD on credit. IMANIL MURATOV and JAVIDNEZHAD would then refuse to pay and would either provide Victim-1 with the goods or sell the goods and provide Victim-1 with the profits. The third option IMANIL MURATOV outlined was to conduct memorandum insurance fraud. IMANIL MURATOV explained that he had an associate from Canada who could come to New York and represent to Victim-1's insurance company that he took goods from Victim-1 on memorandum but subsequently lost them.

16

25.    From speaking with an individual who works in the diamond industry in Manhattan ("CS-1")[1], a review of telephone toll and bank records, and a review of audio recordings, I learned the following, in substance and in part:

a.    CS-1 has purchased diamonds from IMANIL MURATOV a/k/a "Eddy," the defendant, in the past. CS-1 is aware that IMANIL MURATOV's son has worked as a personal assistant to GODEL SEZANAYEV a/k/a "Gary," the defendant, at GODEL SEZANAYEV's diamond business.

b.    On or about the morning of April 3, 2015, IMANIL MURATOV met in person with CS-1 at IMANIL MURATOV's office. At that meeting, which CS-1 recorded with an audio device provided by the FBI, IMANIL MURATOV provided CS-1 with four parcels of diamonds (the "Eddy Diamonds") and stated, in substance and in part, that he wanted CS-1 to broker the sale of the Eddy Diamonds to other buyers.

c.    On or about the afternoon of April 3, 2015, CS-1 brought the Eddy Diamonds to IMANIL MURATOV's office on 47th Street, and informed IMANIL MURATOV that CS-1 had found a buyer for the Eddy Diamonds. IMANIL MURATOV instructed CS-1 to tell the buyer to pay for the Eddy Diamonds by check and to make the check payable to American Gold Refinery, GODEL SEZANAYEV's company.

d.    On or about April 7, 2015, CS-1 received a call from MURATOV at approximately 10:45 am. During that call,

---

[1]CS-1 is a diamond and jewelry merchant who works in the Diamond District. Based on conversations with CS-1, I know CS-1 has agreed to assist the FBI because CS-1 was the victim of a jewelry fraud and CS-1 believes that assisting the FBI may eventually lead to the apprehension of the person who defrauded CS-1. CS-1 has assisted the FBI in multiple investigations since approximately April 2015 and, in that time, CS-1's information has been proven to be credible and reliable. CS-1 has been provided compensation for information in the past and has been reimbursed by the FBI for expenses incurred by assisting law enforcement, including, on two occasions, for office rent payments.

IMANIL MURATOV instructed CS-1 to pick up the Eddy Diamonds from IMANIL MURATOV's office.

e.    Immediately after the telephone call with IMANIL MURATOV, CS-1 traveled to IMANIL MURATOV's office, where CS-1 met with MURATOV. The FBI provided CS-1 with a recording device and the meeting was recorded. IMANIL MURATOV, in substance and in part, told CS-1 that (i) MURATOV had spoken to GODEL SEZANAYEV immediately prior to CS-1's arrival at IMANIL MURATOV's office, (ii) GODEL SEZANAYEV was afraid that CS-1 would steal the parcels from GODEL SEZANAYEV because GODEL SEZANAYEV had stolen merchandise from CS-1 in the past, and (iii) CS-1 would suffer consequences if he cheated IMANIL MURATOV and GODEL SEZANAYEV. IMANIL MURATOV gave the Eddy Diamonds to CS-1, and CS-1 then departed IMANIL MURATOV's office.

26.    On or about April 7, 2015, CS-1 provided the Eddy Diamonds to me, and I in turn showed the Eddy Diamonds to Employee-1. After examining the Eddy Diamonds, Employee-1 informed me that, by comparing their physical condition and grade to those described on the sales memoranda for the Selected Diamonds, Employee knew, based on the Employee's training and experience, that the Eddy Diamonds were, in fact, the Selected Diamonds that GODEL SEZANAYEV a/k/a "Gary," the defendant, had taken without full payment. I then returned the Eddy Diamonds to CS-1.

27.    From speaking with CS-1 and a review of bank account records, I learned the following, in substance and in part:

a.    On or about April 7, 2015, CS-1 returned the parcels to IMANIL MURATOV at IMANIL MURATOV's office, and told IMANIL MURATOV that CS-1 had found a buyer willing to pay $25,000 for the Eddy Diamonds and that the buyer would pay by check to American Gold Refinery.

b.    On April 14, 2015, CS-1 met IMANIL MURATOV at CS-1's office and provided IMANIL MURATOV with a check for $10,000 made out to American Gold Refinery and $15,000 cash.

c.   The $10,000 check was negotiated by American Gold on April 14, 2015. The check was drawn on an FBI-controlled account.

28.   Based on conversations with Victim-1 and Employee-1, a review of purchase invoices, and a review of bank account records, I have learned, in part, that on or about July 1, 2015, ALBERT FOOZAILOV, the defendant, visited the Victim-1 Business while Victim-1 was out of the office. Employee-1 agreed to provide FOOZAILOV approximately $215,592.65 in diamonds, with payment due upon delivery. FOOZAILOV agreed. Employee-1 provided the diamonds to FOOZAILOV, but FOOZAILOV took the diamonds and left the Victim-1 business without paying.

*Losses to Victim-1*

29.   Based on conversations with Victim-1, a review of purchase invoices and memoranda, and a review of bank account records related to Victim-1's business, I have learned, in part, the following:

a.   Victim-1 incurred approximately $460,000 in losses as a result of the diamonds taken by GODEL SEZANAYEV a/k/a "Gary," the defendant.

b.   Victim-1 incurred approximately $510,112.65 in losses as a result of the diamonds taken by MANASHE SEZANAYEV a/k/a "Michael," the defendant.

c.   Victim-1 incurred approximately $1,200,609 in losses as a result of the diamonds taken by ALI JAVIDNEZHAD and IMANIL MURATOV a/k/a "Eddy," the defendants.

d.   Victim-1 incurred approximately $237,551.63 in losses as a result of the diamonds taken by ALBERT FOOZAILOV, the defendant.

## The Jewelry Show Conspiracy

30.   Other law enforcement agents and I organized an undercover law enforcement operation in or about May 2015 in New York City and Las Vegas, Nevada, in which two individuals acting at the direction of law enforcement, CS-1 and another individual

who works in the diamond industry ("CS-2"),[2] agreed to participate in a diamond fraud scheme with ARKADIY ISRAILOV, the defendant.

31.   From conducting surveillance, speaking with CS-1 and CS-2, and reviewing recordings of meetings and phone calls made by CS-1 and CS-2, and a review of flight records, I have in substance and in part, the following:

a.   On or about May 19, 2015 at approximately 2:40 p.m., CS-1 met ARKADIY ISRAILOV, the defendant, at a bakery located on the corner of 49th Street and Rockefeller Plaza in Manhattan. Prior to the meeting, the FBI gave CS-1 a recording device, and the meeting was audio recorded.

b.   During the meeting, ISRAILOV invited CS-1 to participate in a scheme to be executed at the JCK Jewelry Show in Las Vegas, Nevada (the "JCK Show"). ISRAILOV explained to CS-1 that ISRAILOV would pose as a purchaser of loose diamonds who would gain the confidence of diamond merchants by, among other things, providing the merchants with references and attending meetings in the company of an older man posing as his financier. ISRAILOV also stated that he intended to acquire diamonds on invoice, pay by fraudulent check, and then abscond with the diamonds. ISRAILOV told CS-1 that CS-1's role in the scheme would be to serve as a reference for ISRAILOV, and that ISRAILOV would pay CS-1 with a portion of the diamonds ISRAILOV obtained from the scheme.

c.   On or about May 20, 2015 at approximately 1:52 p.m., CS-1 called ISRAILOV and asked him to meet at CS-1's office, located on 47th Street. ISRAILOV agreed to do so. A few minutes later, ISRAILOV arrived at CS-1's office. Prior to the meeting, the FBI provided CS-1 with an audio recording device,

---

[2] CS-2 operates a diamond wholesale business and has voluntarily assisted the FBI in this investigation. CS-2 is not being compensated for the assistance being rendered. CS-2 had previously been the victim of a fraud in the Diamond District and assisted the FBI as a gesture of goodwill. CS-2's information has proven reliable in the past and has been corroborated by, among other things, the recordings described herein.

and the meeting between CS-1 and ISRAILOV was recorded. CS-1
informed ISRAILOV that he had identified a potential victim at
the JCK Show. CS-1 and ISRAILOV discussed splitting any goods
they obtained through the scheme prior to leaving Las Vegas, and
ISRAILOV informed CS that ISRAILOV had arranged for an older
Afghan man to pose as his financier.

       d.   On or about May 28, 2015, at the direction
of the FBI, CS-1 traveled to Las Vegas, Nevada to participate in
the fraud.

       e.   On or about May 29, 2015, at approximately
3:15 p.m., CS-1 met ISRAILOV and an unknown man at the
registration desk for the Las Vegas Antique Jewelry and Watch
Show inside the Paris Las Vegas Hotel. Prior to the meeting, the
FBI provided CS-1 with an audio recording device, and the
meeting was recorded. In substance and in part, CS-1 told
ISRAILOV that they may be able to steal goods from CS-2, who was
the owner of a diamond business (the "CS-2 Business"). ISRAILOV
described the scheme to CS-1, in substance and in part, as
follows: an accomplice, NIZAMUDEN AKBARI, the defendant, would
pose as a wealthy person seeking to purchase diamonds and
ISRAILOV would pose as the person selecting the diamonds for the
buyer; CS-1's role was to introduce the CS-2 Business to
ISRAILOV. ISRAILOV and CS-1 agreed to meet with AKBARI on the
evening of May 30, 2015 to discuss the plan, and to meet a
representative of the CS-2 Business the morning of May 31, 2015.

       f.   AKBARI provided CS-1 with a business card.
AKBARI's business card identified his business address to be the
same business address as GODEL SEZANAYEV a/k/a "Gary," the
defendant, but bearing a different business name.

       g.   On or about May 30, 2015, at approximately
9:37 pm, ISRAILOV and CS-1 met at the Tropicana Casino in Las
Vegas, Nevada. AKBARI did not attend. Prior to the meeting, the
FBI provided CS-1 with a recording device and the meeting was
audio recorded. Among other things, and in substance and in
part, CS-1 and ISRAILOV discussed that CS-2 would request
references from ISRAILOV before selling him anything. ISRAILOV
told CS-1 that GODEL SEZANAYEV a/k/a "Gary," the defendant, was
currently in Las Vegas and would serve as a reference for

ISRAILOV in exchange for $25,000. At approximately 10:39 p.m., CS-1 left the meeting with ISRAILOV.

  h. On May 31, 2015, at approximately 10:00 a.m., CS-1 met ISRAILOV and AKBARI in the lobby outside the showroom of the JCK Show at the Mandalay Bay Casino in Las Vegas. Prior to the meeting, the FBI provided CS-1 with a recording device and the meeting was audio recorded. ISRAILOV announced that they would be meeting with representatives of the CS-2 Business. ISRAILOV instructed AKBARI on what to say to the CS-2 Business representatives. ISRAILOV also discussed using GODEL SEZANAYEV as a reference. ISRAILOV stated that GODEL SEZANAYEV would charge a fee, but that GODEL SEZANAYEV had never stolen from the CS-2 Business.

  i. Shortly after their meeting in the lobby, ISRAILOV, AKBARI, and CS-1 walked to the CS-2 Business booth inside the showroom, where they encountered CS-2. The FBI had also provided CS-2 with a recording device and the meeting was audio recorded by CS-2. ISRAILOV told CS-2 that AKBARI was in the business of jewelry manufacturing and that he acted as AKBARI's buyer. ISRAILOV said that he and AKBARI were interested in purchasing goods. CS-2 led the men into the booth's conference room. AKBARI told CS-2 that he had once been business partners with GODEL SEZANAYEV but they had ended their business relationship in 2010 due to interference from SEZANAYEV's father. CS-2 then stepped out of the conference room.

  j. Once CS-2 left the conference room, ISRAILOV called GODEL SEZANAYEV in CS-1 and AKBARI's presence. CS-1 overhead the discussion, which was in Russian, and, using a video and audio recording device, recorded AKBARI's portion of the conversation. ISRAILOV asked GODEL SEZANAYEV to serve as a reference. GODEL SEZANAYEV agreed on the condition that ISRAILOV was to bring the goods they obtained from the fraud to GODEL SEZANAYEV's office in New York to be distributed. GODEL SEZANAYEV also told ISRAILOV that ISRAILOV should not be using AKBARI because AKBARI belonged to GODEL SEZANAYEV.

  k. CS-2 returned and showed ISRAILOV, AKBARI, and CS-1 his diamond inventory. ISRAILOV selected certain items he was interested in purchasing. CS-2 prepared a purchase order for the goods. The total value of the purchase order amounted to

$928,542.95. ISRAILOV provided CS-2 with four references and accompanying phone numbers: GODEL SEZANAYEV, and three other persons doing business in the Diamond District ("Merchant-1," "Merchant-2," and "Merchant-3"). AKBARI tendered to CS-2 a Wells Fargo check in the amount of $928,542.95 (the "Israilov Check"). CS-2 informed ISRAILOV that he would contact ISRAILOV's references before he finalized the deal and asked ISRAILOV to meet again in the afternoon, which ISRAILOV agreed to do. ISRAILOV, AKBARI, and CS-1 then departed.

32.   Based on a review of bank account records for the account associated with the Israilov Check, I know that at the time ISRAILOV presented the Israilov Check the account had a balance of approximately $942.40.

33.   Based on conversations with CS-1 and CS-2, a review of audio recordings created by CS-1 and CS-2, a review of telephone subscriber and toll records, and visual surveillance, I have learned, in part, the following:

a.   CS-2, by telephone from Las Vegas, Nevada, called the references ARKADIY ISRAILOV, the defendant, had provided. The phone number ISRAILOV provided CS-2 for GODEL SEZANAYEV was GODEL SEZANAYEV's office number, which had a 212 area code. The phone numbers ISRAILOV provided for Merchant-1 and Merchant-2 were in the 917 area code. ISRAILOV provided CS-2 with two numbers for Merchant-3, one in the 917 area code and another in the 212 area code. GODEL SEZANAYEV, Merchant-1, Merchant-2, Merchant-3, and Merchant-4 each maintain offices in New York, New York.

b.   At approximately 3:00 pm, CS-2 met with ISRAILOV and AKBARI near the CS-2 Business's booth. CS-1 was not present. CS-2 told ISRAILOV and AKBARI that he would not go forward with the deal. CS-2 returned AKBARI's check.

c.   On June 1, 2015, at approximately 12:46 pm, ISRAILOV confronted CS-1 at the Las Vegas airport and stated that he believed CS-1 stole goods from the CS-2 Business and excluded ISRAILOV from the deal. ISRAILOV said that his debt to CS-1 was extinguished and that CS-1 now owed ISRAILOV $250,000.00. During this conversation, ISRAILOV threatened CS-1's life.

34.   In or about the morning of June 4, 2015, ARKADIY ISRAILOV, the defendant, made an unannounced visit to CS-1's office while CS-1 and CS-1's assistant (the "CS-1 Assistant") were present. Based on conversations with CS-1, I have learned, among other things, that ISRAILOV told the CS-1 Assistant, in substance and in part, that (i) CS-1 had planned to rob the CS-2 Business at the JCK Show in Las Vegas and (ii) CS-1 had cut ISRAILOV out of the deal and kept the merchandise for himself. Then, out of the presence of the CS-1 Assistant, ISRAILOV told CS-1, in substance and in part, that he had better come up with a resolution that pleased ISRAILOV.

35.   In or about the morning of the following day, June 5, 2015, GODEL SEZANAYEV a/k/a "Gary," the defendant, arrived at CS-1's office. Based on conversations with CS-1, I have learned, in part, that GODEL SEZANAYEV, in substance and in part, stated that he wanted to discuss the conflict between CS-1 and ISRAILOV. CS-1, in substance and in part, said that ISRAILOV had sabotaged the deal through incompetence, and that, after the deal had been finalized, ISRAILOV had returned to the CS-2 Business and insisted on paying with a postdated check. SEZANAYEV, in substance and in part, said that (i) it would have been better to pay for goods with a postdated check, otherwise CS-1 and ISRAILOV would have been committing fraud and (ii) if ISRAILOV had succeeded SEZANAYEV would have been able to recoup his money from ISRAILOV.

## The India Fraud Conspiracy

36.   Based on conversations with Victim-1, I have learned that, in or about Spring 2015, ALBERT FOOZAILOV, the defendant, proposed that (a) Victim-1 purchase diamonds on credit in India, (b) ship those diamonds to FOOZAILOV in New York to be sold, and (c) FOOZAILOV and Victim-1 could refuse to pay for the diamonds because there would be no consequence in the United States. Victim-1 refused.

37.   Other law enforcement agents and I have interviewed four individuals ("Victim-2," "Victim-3," "Victim-4," and "Victim-5," and, collectively, the "Mumbai Victims") who each operate diamond wholesale businesses in and around Mumbai, India. In or about September 2016, the Mumbai Victims reported to Indian authorities millions of dollars in losses caused by

ALBERT FOOZAILOV, NATHAN ITZCHAKI, MARK MULLAKANDOV, MARK
NATANZON, MENCHAM ABRAMOV, and SHOLOM MURATOV, the defendants
(collectively, the "India Scheme Defendants"). Based on separate
interviews of the Mumbai Victims, a review of written statements
submitted by each of the Mumbai Victims to Indian authorities,
and a review of purchase invoices and shipping records, I have
learned, in part the following:

      a.    Beginning in December 2015, and continuing
until in or about June 2016, a diamond broker in Mumbai ("CC-4")
introduced the India Scheme Defendants to the Mumbai Victims and
encouraged the Victims to do business with the India Scheme
Defendants. In part because of CC-4's assurances, in part,
because of the India Scheme Defendants' various independent
representations about their business experience, and, in part,
because of know-your-customer documents completed by the India
Scheme Defendants, the Victims agreed.

      b.    CC-4 introduced NATHAN ITZCHAKI and ALBERT
FOOZAILOV, the defendants, to Victim-2 in or about December
2015, Victim-3 in or about February 2016, and Victim-4 in or
about March 2016. Between or about December 16, 2015 and on or
about August 5, 2016, FOOZAILOV, purportedly on behalf of Romano
Diamonds, ordered and received approximately $1,275,221.19 in
diamonds from the Mumbai Victims. Between or about January 2,
2016 and on or about August 23, 2016, ITZCHAKI, purportedly on
behalf of Buy Right Diamond Corp., ordered and received
approximately $3,945,846.85 in diamonds from the Mumbai Victims.

      c.    CC-4 introduced MARK MULLAKANDOV and
MENACHEM ABRAMOV, the defendants, to Victim-2 in or about March
2016, Victim-3 in or about March 2016, Victim-4 in or about May
2016, and Victim-5 in or about May 2016. Between or about March
22, 2016 and on or about July 26, 2016, MULLAKANDOV and ABRAMOV,
purportedly on behalf of Stud Masters USA, Inc., ordered and
received approximately $3,210,860.41 in diamonds from the Mumbai
Victims.

      d.    CC-4 introduced MARK NATANZON, the
defendant, to Victim-2 in or about April 2016, Victim-3 in or
about April 2016, Victim-4 in or about May 2016, and Victim-5 in
or about May 2016. Between or about April 13, 2016 and on or
about July 7, 2016, NATANZON, purportedly on behalf of New Life

25

Diamonds, ordered and received approximately $2,884,855.34 in diamonds from the Mumbai Victims.

      e.    CC-4 introduced SHOLOM MURATOV, the defendant, to Victim-2 in or about May 2016, Victim-3 in or about May 2016, and Victim-5 in or about June 2016. Between on or about May 16, 2016 and July 6, 2016, SHOLOM MURATOV, purportedly on behalf of Millennium Diamonds, ordered and received approximately $1,137,332.04 in diamonds from the Mumbai Victims.

      f.    The Mumbai Victims did not provide all of the diamonds to the India Scheme Defendants at once. Rather, each of the India Scheme Defendants conducted a series of diamond transactions. Typically, the first transaction between a Mumbai Victim and each India Scheme Defendant required payment due upon delivery. In these initial transactions, the India Scheme Defendants would, in fact, pay the respective Victims as agreed, or perhaps ahead of schedule. The India Scheme Defendants would then seek to purchase additional diamonds with some or all of the payment due in the future. In a typical scenario, the defendant would make partial early payments on successive purchases and would then order still additional quantities of diamonds, again with most or all of the payment due in the future. As a result, after a few months, each of the India Scheme Defendant obtained multiple orders of diamonds on credit.

      g.    From India, the Mumbai Victims sent the ordered diamonds to the India Scheme Defendants in New York, New York by secured interstate commercial carrier.

      h.    Beginning in or July 2016, and continuing to in or about November 2016, the India Scheme Defendants' respective balances with each Mumbai Victim became due. The India Scheme Defendants, however, did not pay as agreed. Accordingly, by December 2016, (i) ITZCHAKI owed approximately $2,827,537.68, (ii) FOOZAILOV owed approximately $547,113.79, (iii) MULLAKANDOV and ABRAMOV owed approximately $2,160,386.10, (iv) NATANZON owed approximately $1,900,019.56, and (v) SHOLOM MURATOV owed approximately $906,594.90. Those balances remain outstanding.

38.   Unbeknownst to the victims at the inception of the fraud, the India Scheme Defendants were, in fact, coordinating with one another. Based on bank records, New York Department of State records, telephone toll records, and travel itineraries, I have learned, in part, the following:

a.   Buy Right Diamond Corp., the business of NATHAN ITZCHAKI, the defendant, and Romano Diamonds, Inc., the business of ALBERT FOOZAILOV, the defendant, actually share the same office space and ITZCHAKI created and controls at least one of Romano Diamond's bank accounts.

b.   Further, during the course of the fraud, bank accounts under ITZCHAKI's control received wire transfers from bank accounts under the control of MARK MULLAKANDOV, the defendant. For instance, on or about May 5, 2016, Stud Masters USA, Inc., a business controlled by MULLAKANDOV, transferred approximately $30,000 to Nathan Itzchaki, Inc., a business controlled by ITZCHAKI. The transfer occurred on or about the same day that Buy Right Diamond Corp. made an approximately $25,087.00 payment to Victim-2.

c.   Additionally, during the course of the fraud, bank accounts under the control of MARK NATANZON, the defendant, received wire transfers from banks accounts under FOOZAILOV's control. For instance, on or about June 1, 2016, Romano Diamonds, Inc. transferred approximately $270,000 to NATANZON's business, New Life Diamond Corp. That transfer occurred approximately on (i) the same day that New Life Diamond Corp. paid approximately $88,731.48 to a Victim-2 business, (ii) two days before New Life Diamond Corp. paid an additional approximately $80,000 to a Victim-2 business, and (iii) sixteen days before New Life Diamond Corp. paid approximately $106,758.40 to a Victim-4 business.

d.   Finally, a number of defendants were in frequent telephone contact during the course of the scheme. Between on or about December 2, 2015 and October 27, 2016, FOOZAILOV and ITZCHAKI were in call contact approximately 1,787 times; between on or about November 9, 2015 and October 31, 2016, FOOZAILOV and MULLAKANDOV were in contact approximately 1,485 times; between on or about November 19, 2015 and October 31, 2016, FOOZAILOV and ABRAMOV were in call contact approximately 143 times; and between March 30, 2016 and October

27, 2016, ABRAMOV and MULLAKANDOV were in call contact 167 times.

39.    After each defendant failed to pay as promised, Victim-2, acting at the direction of the FBI, confronted a number of the India Scheme Defendants to demand repayment. For example, on or about November 10, 2016, Victim-2 met ALBERT FOOZAILOV and NATHAN ITZCHAKI, the defendants, in the office of Romano Diamonds in Manhattan, New York. The meeting was audio recorded. Based interviews of Victim-2 and a review of the recording of the conversation, I have learned, that during the meeting, in substance and in part, the following statements were made:

        a.    Among other things, FOOZAILOV told Victim-2 that (i) FOOZAILOV "took the stuff to somebody," (ii) FOOZAILOV no longer had the diamonds he obtained from Victim-2, (iii) FOOZAILOV would repay Victim-2, and (iii) MARK MULLAKANDOV, the defendant, had taken the diamonds from FOOZAILOV.

        b.    Among other things, ITZCHAKI told Victim-2 that (i) he would repay him at a rate of $10,000 per month, (ii) ITZCHAKI's non-payment was a civil matter, (iii) most the goods ITZCHAKI had obtained from Victim-2 had been taken by a customer of MULLAKANDOV's, (iv) MULLAKANDOV had given ITZCHAKI a bad check for the goods, so ITZCHAKI did not have any cash to repay Victim-2, and (v) ITZCHAKI retained some of the goods from Victim-2 but ITZCHAKI needed to sell those goods to repay a private debt.

40.    On or about December 21, 2016, Victim-2 met SHOLOM MURATOV and MENACHEM ABRAMOV, the defendants, in a shopping center in Manhattan, New York. The discussion was audio recorded. Based on conversations with Victim-1 and a review of the recording of the conversation, I have learned, that during the meeting, in substance and in part, the following conversation ensued:

        a.    SHOLOM MURATOV told Victim-2 that (i) SHOLOM MURATOV and ABRAMOV had been paid by MULLAKANDOV to act as buyers, (ii) MULLAKANDOV had paid SHOLOM MURATOV and ABRAMOV's travel expenses; (iii) FOOZAILOV and MULLAKANDOV were leading the scheme; (iv) FOOZAILOV and MULLAKANDOV had approached MURATOV and said, in substance, "Please don't talk, please don't

talk," and (v) MULLAKANDOV threatened to blackmail SHOLOM
MURATOV if MURATOV spoke about the scheme.

       b.    ABRAMOV told Victim-2 that MULLAKANDOV is
the head of the scheme and that FOOZAILOV and ITZCHAKI are
second-in-charge and that FOOZAILOV was selling Victim-2's goods
for twenty cents on the dollar.

       41.  On or about December 23, 2016, Victim-2 called
MARK MULLAKANDOV, the defendant, by telephone. The call was
audio recorded. Based on conversations with Victim-2 and a
review of the recording of the conversation, I have learned,
that during the call, in substance and in part, MULLAKANDOV told
Victim-2 that (a) MULLAKANDOV gave the goods he obtained from
Victim-2 to another person, whom MULLAKANDOV refused to name,
and (b) MULLAKANDOV was attempting to collect money to pay
Victim-2.

       42.  On or about December 23, 2016, Victim-2 met MARK
NATANZON, the defendant, at a restaurant in Manhattan, New York.
The meeting was audio recorded. Based interviews of Victim-2 and
a review of the recording of the conversation, I have learned,
that during the meeting, in substance and in part, NATANZON told
Victim-2 that (a) ITZCHAKI had introduced NATANZON to CC-4, (b)
NATANZON had taken the goods NATANZON obtained from Victim-2 to
Russia by carrying them across the border in his pockets, and
(c) NATANZON had given the goods to NATANZON's cousin "Sasha,"
who had not paid NATANZON.

*Losses to the Mumbai Victims*

       43.  Based on a review of bank records, order
invoices, and shipping records, I have learned, in part, the
following:

       a.    NATHAN ITZCHAKI, the defendant, has not made
a payment to the Mumbai Victims since in or about August 16,
2016; ALBERT FOOZAILOV, the defendant, has not made a payment to
the Mumbai Victims since in or about August 5, 2016; MARK
MULLAKANDOV, the defendant, has not made a payment to the Mumbai
Victims since on or about July 7, 2016; MARK NATANZON and
MENACHEM ABRAMOV, the defendants, have not made a payment to
Mumbai Victims since on or about July 4, 2016; and SHOLOM

MURATOV, the defendant, has not made a payment to the Mumbai Victims since June 30, 2016.

b.    As a result of the India Scheme Defendants, (i) Victim-2 has incurred approximately $2,375,578.68 in losses, (ii) Victim-3 has incurred approximately $2,414,930.00 in losses, (iii) Victim-4 has incurred approximately $1,353,122.72 in losses, and (iv) Victim-5 has incurred approximately $1,298,020.65 in losses.

WHEREFORE, I respectfully request that arrest warrants be issued for GODEL SEZANAYEV a/k/a "Gary," MARK MULLAKANDOV, ALBERT FOOZAILOV, IMANIL MURATOV, a/k/a "Eddy," MANASHE SEZANAYEV a/k/a "Michael," NATHAN ITZCHAKI, ARKADIY ISRAILOV, ALI JAVIDNEZHAD, MARK NATANZON, SHOLOM MURATOV, MENACHEM ABRAMOV, and NIZAMUDEN AKBARI, the defendants, and that he be arrested and imprisoned or bailed, as the case may be.

_____
Special Agent Luke B. Hardison
Federal Bureau of Investigation

Sworn to before me this
31st day of March, 2017

_____
HONORABLE JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK